Phillip NELSON

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY
et al.

Civ. A. No. 75–987.

United States District Court,
E. D. Pennsylvania.

Oct. 22, 1976.

Lawrence A. Mendelson, Community Legal Services, Inc., Philadelphia, Pa., for plaintiff.

David F. Girard-diCarlo, Eugene John Lewis, Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

Plaintiff, Phillip Nelson, brought suit against his former employer, Southeastern Pennsylvania Transportation Authority (SEPTA); three of SEPTA's officers; the Union of which he was a member, the Transport Workers Union of Philadelphia, Local 234 AFL–CIO (Union); and two officers of the Union. Plaintiff's complaint, as amended, charges that SEPTA discharged plaintiff without just cause and without adequate notice or hearing, and thereby violated plaintiff's rights under the Fourteenth Amendment to the Constitution; the Civil Rights Act, 42 U.S.C. § 1983; and the Pennsylvania Metropolitan Transportation

Authorities Act of 1963, 66 P.S. § 2001, et seq. The complaint further charges that the Union breached its duty to fairly represent plaintiff in his grievance of the discharge. Finally the complaint charges that the Union and SEPTA conspired to violate plaintiff's rights.

The defendants jointly filed a motion to dismiss the complaint. Accompanying the motion was an affidavit and other materials beyond the pleadings. Under Fed.R.Civ.P. 12(c) the motion could properly be treated as one for summary judgment under Rule 56. The parties so regarded it, and plaintiff filed a supplemental memorandum, together with an affidavit, and defendants filed a supplemental memorandum.

■ Because of the conclusion I reach as to abstention, I will not deal with the merits of the various contentions raised by defendants' motions, but I have nevertheless viewed the facts by the same standard as is required in dealing with motions for summary judgment, i. e., by resolving all material factual disputes against the moving parties. See First Pennsylvania Banking and Trust Co. v. United States Life Insurance Co., 421 F.2d 959, 962 (3d Cir. 1969). It is in that light that the facts are presented below.

## FACTS

SEPTA was created by the Pennsylvania Legislature in 1963, and is responsible for providing public transportation in Philadelphia and the surrounding counties. SEPTA is an instrumentality and agency of the State, not of the cities and counties in which it operates, and it has been accorded all needed powers by the State.[1] See 66 P.S. § 2001, et seq.

Plaintiff Nelson was originally hired by SEPTA on October 25, 1965 as a vehicle overhauler. He was laid off on December 10, 1965 and was rehired on March 7, 1968 as a cleaner. From March 1968 until December 1971 Nelson was employed continu-

---

1. One member of SEPTA's governing body is appointed by the Governor, and most of the other members are appointed by County Commissioners. The mayors of cities of the first class (of which Philadelphia is the only one) may, with the approval of City Council, also appoint a limited number of Board members. See 66 P.S. § 2016.

ously with SEPTA in various jobs as a cleaner, painter, vehicle overhauler type N, vehicle rebuilder type P, and rail operator (trainman). On December 20, 1971 he was promoted to the position of bus driver (operator). In January 1972 he became ill and was hospitalized from January 20 until May 15 for a recurrence of pre-existing medical problems, including migraine headaches, hypertension and respiratory dysfunction. On October 25, 1972 Nelson was medically disqualified by SEPTA's physician to perform the job of bus driver, and he was transferred to the job of cashier. On September 2, 1973 he was promoted from cashier to stationman. During his tenure as stationman, Nelson suffered a non-job related injury which caused him to take an extended period of sick leave. He did not return to work until February 6, 1974, six days before exhausting his 60 day annual sick leave allotment.

Nelson was requalified medically for the job of bus driver and transferred to that position on August 18, 1974. Early in October 1974 Nelson's previously described medical problems again became aggravated, and he stopped reporting for work. His personal physician advised him that he would be permanently unable to work as a bus driver. On October 6, 1974 Nelson was examined by the SEPTA physician, who found that Nelson's condition was not such as to make him permanently disabled or medically disqualified to work as a bus driver. At the time of the examination, however, Nelson requested that he be transferred to the job of cashier. On October 7, 1974 Nelson made a written application for the job of vehicle overhauler. On the same day he made an oral request to James O'Brien, a SEPTA personnel officer, to be transferred to the position of cashier. None of these requests was ever acted upon by SEPTA.

On October 8, 1974 SEPTA sent Nelson written notice that unless he returned to work by November 6, 1974 he would exceed his sick leave and would be terminated. The letter did not indicate why Nelson's requests for transfer had not been granted,

nor did it state what means were available to Nelson to contest his discharge, specifically it made no mention of a right to a hearing of any kind.

On October 10, 1974 Nelson again contacted O'Brien and stated that he wished to file an application for transfer to the job of stationman. O'Brien refused to acknowledge Nelson's request for a transfer, stating that there was a six year wait for the position of stationman.

On at least three occasions between October 6, 1974 and November 6, 1974, the date of his discharge, Nelson orally requested Union officials to initiate a grievance hearing relating to his imminent discharge and SEPTA's refusal to transfer him. Joseph Bepko, a Union official, told Nelson that the Union would not file a grievance on his behalf, and said that neither the Union nor Nelson could contest the finding of the SEPTA physician that Nelson was not permanently disabled from performing the job of bus driver.

Nelson was terminated by SEPTA on November 6, 1974, and notice to that effect was mailed to him on the same day. The termination letter made no mention of any rights Nelson might have to appeal or contest his dismissal.

On November 12, 1974, following Nelson's discharge, the Assistant Director of Industrial Relations for SEPTA, W. H. Crocker, wrote to Ned LeDonne, President of Local 234, regarding Nelson, and stated:

"In response to Mr. Bebco of your staff requesting the Authority to accept a grievance on behalf of operator P. Nelson.

As you and Mr. Bebco know that [sic] in the labor agreement between the Authority and Transport Workers Union, Local 234, Article V, Section 502, Sick Leave, Paragraph (j) states, 'Any employe whose absence due to illness exceed [sic] the amount of sick leave to which he is entitled will be automatically dropped from Authority service.' Further, the Authority has never made an exception to this rule, and in view of Mr. Nelson's consistently substandard attendance record, we

would never consider an exception be made in his case."

Throughout the time Nelson was a SEPTA employee, the Union, Local 234, represented him and was the exclusive bargaining unit for employees of Nelson's classification. See 43 P.S. § 1101.606. As a condition of employment Nelson was required to become a member of the Union. See the SEPTA–Local 234, AFL–CIO Collective Bargaining Agreement (hereinafter the Agreement) § 12.

The Agreement in force at the time Nelson was discharged provided a grievance and arbitration mechanism whereby a grievance was processed through three stages, and if then still unresolved, could be taken to arbitration. See Agreement §§ 201–203. At the first stage, the grievance is presented to the employee's foreman or superintendent. An employee charged with an infraction of SEPTA's rules or regulations, improper conduct, or dereliction of duty must be notified of the charge and have an interview with his Superintendent or Foreman before he is barred from reporting to work, except for certain serious rule infractions, for example, being under the influence of drugs.

If the foreman or superintendent renders an unfavorable decision, the grievance may be taken to the Department Head. The grievance must be in writing on the appropriate forms. The Department Head may at his discretion hold a hearing. In any case where the employee is discharged, the second step of the procedure is of right. If the Department Head's decision, which must also be in writing, is unfavorable, the third stage of grievance machinery may be engaged. At the third stage of the procedure the grievance is presented to SEPTA's "third stage representative" for discussion at a weekly meeting.

If the grievance is still not satisfactorily resolved following the third stage of the procedure, the grievance may be taken to arbitration, the arbitration board consisting of three members; one appointed by the Union, one by SEPTA, and the third designated according to the rules of the American Arbitration Association. The decision of the arbitration board is binding on both the Union and SEPTA.

Either the aggrieved employee or the Union may process the grievance through the first three stages. Only the Union, however, may take a grievance to arbitration. Agreement §§ 201(k), 202(a). In the present case, Nelson made no attempt to prosecute a grievance himself.

## DISCUSSION

### I. *Counts 2 and 3*

The foundation for this court's jurisdiction of plaintiff's claim is the second count of his amended complaint. Count 2 charges that

"Defendants, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C.A., § 1983 discharged plaintiff without providing him with timely, adequate notice detailing the reasons for his discharge and denial of his transfer, and informing him of his right to a hearing; nor did defendants afford plaintiff the opportunity for a hearing comporting with due process of law."

Although the second count is labeled only as "v. all SEPTA Defendants," read in conjunction with the third count, which charged that the Union and SEPTA conspired to violate plaintiff's rights as set forth in the second count, the second count furnishes the jurisdictional basis for the complaint against both Union and SEPTA defendants.

■ The second count relies on the command of the Fourteenth Amendment that a "State [shall not] deprive any person of life, liberty, or property, without due process of law." SEPTA and its officers do not deny that, since SEPTA is an instrumentality of the state, its actions are "state action" and are, therefore, governed by the requirements of the Fourteenth Amendment. Their challenge to Count 2 is based, instead, on the contention that no interest of plaintiff which is encompassed by the terms, "life, liberty or property" was affected by his termination, and that even if such an interest was affected, the termination pro-

cedure was consistent with due process standards.[2] *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Nelson contends that his job was a property interest within the Fourteenth Amendment's meaning of that term, and that due process requirements were not met because (1) he was not given adequate notice as to the reason for his discharge, (2) he was not informed as to his right to a hearing or grievance procedure to contest the discharge, and (3) he was in fact not given a pretermination hearing relating to his discharge as required under current Fourteenth Amendment standards.

A. *Applicability of Due Process Standards*

Nelson's claim that he had a property interest in his employment with SEPTA must be examined in light of the recent Supreme Court decision in *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), holding that a non-probationary police officer employed by the city of Marion, North Carolina, did not have a property interest in his job. The policeman, in asserting a property interest, relied on a city ordinance providing that a permanent employee could be discharged if he failed to perform work up to the standard of his classification, or if he was negligent, ineffi-

cient or unfit to perform his duties. The policeman contended that the ordinance should be read to prohibit discharge for any other reason, and, therefore, to confer tenure on all permanent employees. He also contended that his period of service, together with his "permanent" classification, gave him sufficient expectancy of continued employment to constitute a protected property interest.

Both the District Court and the Court of Appeals in *Bishop* found that the policeman did not have a property interest in his job. In affirming, the Supreme Court emphasized that "the sufficiency of the claim of entitlement [to a property interest] must be decided by reference to state law." Noting that the District Court Judge had considerable experience with North Carolina law, the Court then concluded:

> "The District Court's reading of the ordinance is tenable; it derives some support from a decision of the North Carolina Supreme Court, *Still v. Lance, supra;* and it was accepted by the Court of Appeals for the Fourth Circuit. These reasons are sufficient to foreclose our independent examination of the state law issue." *Id.,* 426 U.S. at 347, 96 S.Ct. at 2079.

▮ The substance of the Supreme Court's ruling seems clear: Whether a state employee has a property interest in his job is to be determined by state law. In making that determination, great weight is to be given to expressions by the state legisla-

---

**2.** SEPTA itself has urged as a separate ground to dismiss the action against it that it is not a "person" within the meaning of § 1983. There is no doubt that SEPTA is correct in that contention. Various cases have established that municipalities, states and instrumentalities of states are not "persons" subject to suit thereunder. *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Gittelmacker v. County of Philadelphia,* 413 F.2d 84 (3d Cir. 1969), cert. denied, 396 U.S. 1046, 90 S.Ct. 696, 24 L.Ed.2d 691 (1970); *Edwards v. Philadelphia Electric Co.,* 371 F.Supp. 1313 (E.D.Pa.1974), aff'd 510 F.2d 969 (1975). *See also Allison v. California Adult Authority,* 419 F.2d 922 (8th Cir. 1969); *Brown v. Pennsylvania,* 311 F.Supp. 1176 (E.D.Pa.1970).

At oral argument counsel for plaintiff argued that the complaint asserts a claim for denial of due process, not only under 42 U.S.C. § 1983, but also directly under the Fourteenth Amendment, and that jurisdiction lies under the federal question provision, 28 U.S.C. § 1331. The question whether suit may be instituted under § 1331 against a party exempt from suit under § 1983 is the subject of disagreement among the members of this court. Compare, *e. g.,* *Pitrone v. Mercadante,* 420 F.Supp. 1384 (E.D. Pa.1976) with *Santore v. City of Philadelphia* (C.A. 76–904, September 28, 1976). Although my own views coincide with those expressed by Judge Ditter in *Pitrone, cf. Roach v. Kligman,* 412 F.Supp. 521, 528–29 (E.D.Pa.1976), I do not reach the question here because of the impact of state law questions. *See* text, *infra.*

ture, or, if a local ordinance is involved, by the local legislative body. If the legislative body clearly intended to, or not to, create a property interest, its decision would be binding on all. If the legislative body has not clearly spoken, then the interpretation placed on the statute or ordinance by the state courts would be binding. Only where neither the legislative body nor the state courts have definitively spoken, may the federal courts decide whether state law creates a property interest in a state employee's job. Where the federal courts find it necessary to interpret state law, that interpretation must be based on that state's law, rather than federal law or the law of other states which by analogy might suggest whether the employee had a property interest in his job. *See id.,* 426 U.S. at 345 n. 8, 96 S.Ct. 2074. *See also Board of Regents v. Roth,* 408 U. S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Nelson relies on Pennsylvania's Metropolitan Transportation Authorities Act of 1963, 66 P.S. § 2001, et seq., in support of his contention that he had a property interest in his job. Section 2025(a) of the Act provides in part that "[n]o officer or employee shall be discharged or demoted except for just cause." The Pennsylvania legislature has given no indication as to whether it intended to create a property interest in employment under the Metropolitan Transportation Act, and I have not found any decision of the Pennsylvania courts which decides, or even comments on, the interest in continued employment created by § 2025(a). Nelson argues that the Pennsylvania Civil Service Act, 71 P.S. § 741.807, is comparable to § 2025(a), and that the Pennsylvania courts have repeatedly found that civil servants have a property interest in employment. Plaintiff's position is tenable. Both statutory sections require "just cause" for dismissal, and on occasion the Pennsylvania courts have seemed to assume that due process requirements apply to dismissal from the civil service. *See, e. g., McClelland v. State Civil Service Commission,* 14 Pa.Cmwlth. 339, 322 A.2d 133 (1974); *Rizzo v. Civil Service Commission,* 17 Pa.Cmwlth. 474, 333 A.2d 212 (1975). I have found no

Pennsylvania case, however, which explicitly deals with whether Pennsylvania civil servants have a property interest in their job. *Cf. In re Geis,* 341 Pa. 413, 19 A.2d 368, 369 (1941).

Defendants, in support of their position that Nelson lacked a property interest in his job, cite the general rule in Pennsylvania that if a contract of employment "does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will." *Cummings v. Kelling Nut Co.,* 368 Pa. 448, 451, 84 A.2d 323, 325 (1951). If Nelson's employment was terminable at will, they argue, he clearly lacked a property interest in his job. Defendants also rely on the similarity of the statutory language in *Bishop v. Wood, supra,* and the language of § 2025(a) in the present case.

Defendants' position is somewhat overstated. Obviously Nelson's employment was not terminable at will, since it could only be terminated for just cause under § 2025(a). The statutory language in *Bishop v. Wood, supra,* is not the same as the "just cause" provision in the instant case. In *Bishop* the city ordinance provided:

> "If a permanent employee fails to perform work up to the standard of the classification held, or continues to be negligent, inefficient, or unfit to perform his duties, he may be dismissed by the City Manager." 426 U.S. at 344, 96 S.Ct. at 2077.

Admittedly, the ordinance would seem to preclude dismissal except for reasons that would normally be subsumed under the heading "just cause," but the Supreme Court did not rely on that interpretation. Rather, the Supreme Court deferred to the District Court's interpretation of state law, which was based on a decision of the North Carolina Supreme Court. The Supreme Court found that such deference was appropriate "even if an examination of the state law issue without such guidance might have justified a different conclusion." *Id.,* 426 U.S. at 346, 96 S.Ct. at 2078. The Supreme Court noted that *Arnett v. Kennedy,*

416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), involving a federal statute, "sheds no light on the problem presented by this case." 426 U.S. at 345 n. 8, 96 S.Ct. at 2078. Likewise, the interpretation placed on the city ordinance in *Bishop v. Wood* by the North Carolina Supreme Court and the District Court Judge sitting in North Carolina sheds no light on the instant case, which must be determined by Pennsylvania law.

In sum, neither plaintiff nor defendants have offered persuasive arguments that Nelson enjoys, or lacks, a property interest in his job. My own research has failed to uncover significant state law authority for either proposition.

## B. Abstention

■ In *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Supreme Court held that when a federal constitutional claim is based on an unsettled question of state law, the federal court should stay its proceedings in the suit and required the parties to seek a state court determination of the underlying state law question. By so doing, the federal court can avoid the possibility of unnecessarily deciding the constitutional question presented to it. As the Court recently stated:

"abstention is appropriate where an unconstrued state statute is susceptible of a construction by the state judiciary 'which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.' " *Bellotti v. Baird,* —— U.S. ——, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976).

■ The abstention process often results in the delay of a final adjudication of the dispute, and because this may endanger the vindication of "valuable federal rights" the Supreme Court has warned that "abstention must be invoked only in 'special circumstances,' and only upon careful consideration of the facts of each case." *Harris County Commissioners Court v. Moore,* 420 U.S. 77, 83, 95 S.Ct. 870, 875, 43 L.Ed.2d

32 (1975) (citations omitted). In a case where an unconstrued state statute may well be construed so as to entirely eliminate the constitutional issue, the Court has indicated that abstention is appropriate:

"Among the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law. If the state courts would be likely to construe the statute in a fashion that would avoid the need for a federal constitutional ruling or otherwise significantly modify the federal claim, the argument for abstention is strong." *Id.* at 84, 95 S.Ct. at 875.

Although a plaintiff in a civil rights suit is not required to exhaust state remedies before he may bring suit in federal court, the abstention doctrine is as applicable in civil rights suits as in any other. *Lewellyn v. Gerhardt,* 513 F.2d 184, 187 (7th Cir. 1975); *Blouin v. Dembitz,* 489 F.2d 488, 491–92 (2d Cir. 1973). *Cf. Anonymous J. v. Bar Association,* 515 F.2d 435 (2d Cir.), *cert. denied,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975).

■ Ordinarily, if the federal court determines that it should abstain, it should not dismiss the federal suit, but should stay all proceedings pending the resolution of the state law issues in state court. *Harris County Commissioners Court v. Moore, supra,* 420 U.S. at 88 n. 14, 95 S.Ct. 870. If retaining jurisdiction will impede bringing suit in state court, the proper course is to dismiss the federal court suit without prejudice. *Id.* Even if dismissal of the federal suit is not required for a state court adjudication, the federal court appears to have discretionary power to dismiss without prejudice rather than retain jurisdiction if such dismissal is more appropriate in the particular case. *See American Trial Lawyers Association v. New Jersey Supreme Court,* 409 U.S. 467, 469, 93 S.Ct. 627, 34 L.Ed.2d 651 (1973); *Zwickler v. Koota,* 389 U.S. 241, 244 n. 4, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Farley v. Farley,* 481 F.2d 1009 (3d Cir. 1973).

In the instant case, whether Nelson had a property interest in his job depends upon state law. If that issue is decided against him, there would be no need to reach the question whether the procedures by which Nelson was discharged comported with constitutional due process standards.

Whatever property rights Nelson claims to have in his employment with SEPTA stem from § 2025(a) of the Metropolitan Transportation Authorities Act. The absence of state interpretation, legislative or judicial, of that provision of the Act furnishes an unsteady foundation on which to predict how the Pennsylvania courts will ultimately resolve the "property interest" issue. The state courts' interpretation of the "just cause" language of § 2025(a) will undoubtedly be affected by the relatively new Public Employe Relations Act, 43 P.S. § 1101.101, et seq., and by the fact that a Collective Bargaining Agreement has been entered into between SEPTA and the Union. It must be determined under state law whether the Collective Bargaining Agreement either modifies or defines "just cause" by providing for the automatic dismissal of employees who exceed the bargain for sick leave allotment, and if so, whether the parties have the power, through collective bargaining, to modify or to define rights created by an act of the Pennsylvania legislature. (See, e. g., §§ 1101.703 and 1101.706).

The Public Employe Relations Act (PERA), enacted in 1970, is in some respects comparable to the National Labor Relations Act in that it establishes a framework of union representation, collective bargaining, and resolution of union-employer disputes for Pennsylvania's public employees, including employees of SEPTA. See 43 P.S. § 1101.301(1). Like the National Labor Relations Act, PERA imposes an obligation on the union and employer to bargain in good faith (§ 1101.701), and it prohibits unfair labor practices. (See §§ 1101.1201, 1101.-1301, et seq.) The National Labor Relations Act has been found to impose a duty of fair representation upon the union. See Vaca v. Sipes, 386 U.S. 171, 176–78, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The Pennsylva-nia courts may well interpret PERA to impose a like obligation on unions representing public employees. See §§ 1101.606, 1101.701. The state courts will be free to derive different, and conceivably more stringent requirements of representation than have the federal courts. The state courts may well conclude that under PERA the Union had the obligation to do more to represent Nelson in the grievance proceedings than was provided in the Collective Bargaining Agreement. See § 1101.903.

■ Unsettled and complex questions of state law clearly pervade the issue of whether Nelson had a property interest in his job with SEPTA, and beyond that, the type of process to which he was entitled before dismissal. The state law questions are novel, or are of first impression for the Pennsylvania state courts, and they have importance for the state far beyond the issue of whether public employment constitutes a property interest for public employees. These questions belong in the state courts; the federal courts should not be the arbiters of the duties created by the Pennsylvania Public Employe Relations Act and the Metropolitan Transportation Authorities Act. As the Supreme Court stated last term:

"The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074,

2080, 48 L.Ed.2d 684 (1976) (footnote omitted).

Having concluded that the proper course is to abstain from deciding the merits of the second count of plaintiff's complaint, I must also abstain from any decision as to Count 3. Count 3 of plaintiff's Amended Complaint charges that:

"Defendant SEPTA and Union defendants conspired to violate, and did violate, plaintiff's constitutional rights as set forth in Count II by agreeing to plaintiff's discharge and further agreeing to deprive plaintiff of the opportunity for a hearing." ·

Count 3 alleges a conspiracy to bring about the acts which Count 2 alleges violated plaintiff's due process rights. The conspiracy charge cannot be decided without deciding the merits of plaintiff's claims in Count 2.

II. *Count 5*

Count 5 of the Amended Complaint states that:

"SEPTA's arbitrary and capricious discharge of plaintiff deprived plaintiff of substantive due process, contrary to the Fourteenth Amendment of the Constitution of the United States and the Civil Rights Act, 42 U.S.C. § 1983."

Substantive due process is a doctrine to which the Supreme Court never quite admitted, even in the heyday of *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), and a doctrine which saw its demise in *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), and *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). In recent years, however, the Supreme Court has handed down decisions which appear to turn on reasoning akin to substantive due process. *See, e. g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). These cases suggest that the state may not legislate or act in an arbitrary, capricious or invidious manner to limit the rights of its citizens; that state action must be rationally related to achieving permissible goals.

*Cf. Bennett v. Prasse,* 408 F.Supp. 988, 998–99 (E.D.Pa.1976).

In support of his fifth count, plaintiff cites *Slochower v. Board of Higher Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Thompson v. Gallagher,* 489 F.2d 443 (5th Cir. 1973); and *Strickland v. Inlow,* 485 F.2d 186 (8th Cir. 1973), *rev'd sub nom., Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In *Strickland* the Court of Appeals for the Eighth Circuit uses the phrase "substantive due process," without citation, for the limited proposition that the decision of a school board could not stand where there was no evidence to support one of the conclusions reached by the board. *Slochower, Wieman* and *Thompson* each stand for the proposition that the due process clause prohibits the state from acting in an arbitrary or capricious manner. In *Slochower* and *Wieman* the arbitrary government action was coupled with the denial of a constitutional right beyond the right to due process. In the instant case no independent constitutional right is involved.

Any determination as to whether defendants' actions resulting in Nelson's dismissal were arbitrary or capricious requires that those actions be compared against a standard. An arbitrary act is the result of a decision made without reason or a decision based on an impermissible reason. In different situations far more or less detailed reasons are required for the decision to be non-arbitrary. Likewise, the range of acceptable reasons may be more or less broad; an acceptable reason in one case may be an arbitrary reason in another. Plaintiff has given no indication of what standards, in his view, the court should apply.

To the extent that plaintiff's fifth count alleges that defendants' actions were arbitrary when judged against some standard established by the Metropolitan Transportation Authorities Act, 66 P.S. § 2001, et seq., the Pennsylvania Public Employe Relations Act, 43 P.S. § 1101.101, et seq., or the Collective Bargaining Agreement between SEPTA and the Union, it is only

appropriate that this claim be considered by the state court together with the other state court issues. To the extent that plaintiff's fifth count is based on a more abstract, "constitutional," standard—it is this apparent lack of standards that has been one reason for the questionable validity of the concept of substantive due process—this court should abstain from deciding this issue also so long as state court interpretation of state law may avoid that constitutional question.

### III. Counts 1 and 4

 The remaining two counts of the complaint set forth claims over which this court has jurisdiction only as pendent state claims. Count 1 alleges that the Union willfully breached its duty of fair representation to plaintiff. Count 4 alleges that SEPTA violated § 2025(a) of Pennsylvania's Metropolitan Authorities Act of 1963 by discharging plaintiff without "just cause."

Although there is a federal law duty of fair representation it applies only to employees covered by the National Labor Relations Act, 29 U.S.C. § 141, et seq., and the Labor Management Relations Act, 29 U.S.C. § 185, et seq. SEPTA employees are exempted from both Acts since SEPTA is a political subdivision of the state. *Crilly v. Southeastern Pennsylvania Transportation Authority,* 529 F.2d 1355 (3d Cir. 1976). Nelson must, accordingly, base his claim for breach of the Union's duty of fair representation upon state law. *See* 43 P.S. § 1101.-701.

Since I have concluded that Nelson's federal constitutional claims turn on unresolved issues of state law which should, in the first instance, be left to the state courts to decide, I have grave doubts that I have the *power* to decide the pendent state claims, *see Rosado v. Wyman,* 397 U.S. 397, 404, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187 (3d Cir. filed August 13, 1976), at 16–17; *Mattingly v. Elias,* 482 F.2d 526, 528 (3d Cir. 1973); *Braden v. University of Pittsburgh,* 477 F.2d 1, 4 n. 5 (3d Cir. 1973); *Smith v. Spina,* 477 F.2d 1140, 1143 (3d Cir. 1973);

*Royston v. Eastern Empire Corp.,* 393 F.Supp. 1010 (E.D.Pa.1975), but even if the power exists, the exercise of it is a matter committed to my discretion. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In view of my decision to abstain because of the state law claims underlying the federal constitutional claims, the only reasonable conclusion is that the pendent state claims should be tried at the same time in the state courts. Accordingly, if I have the *power* to entertain the pendent state claims at this time, I decline to do so.